UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:05CV-63-R

WESTLAKE VINYLS, INC.                                                                                    PLAINTIFF

v.

GOODRICH CORPORATION                                                                            DEFENDANT

**MEMORANDUM OPINION**

This matter is before the Court on Third Party Defendant PolyOne Corporation's Motion to Dismiss Third Party Plaintiff Goodrich Corporation's Third Party Complaint (Docket #20). Goodrich filed a response (Docket #29) to which PolyOne has replied (Docket #30). This matter is now ripe for adjudication. For the reasons that follow, PolyOne's Motion to Dismiss is DENIED.

**BACKGROUND**

Beginning in the 1950s, Goodrich owned and operated chemical manufacturing plants at the former BF Goodrich Industrial Complex in Calvert City, Kentucky (the "Facility"). For nearly forty years, Goodrich used unlined, earthen ponds to treat, store, and dispose of hazardous waste. One of these ponds was Pond 4. In 1986, Goodrich began to close these ponds, including Pond 4, pursuant to a Resource Conservation and Recovery Act ("RCRA") interim status Closure Plan. In closing Pond 4, Goodrich excavated the material from the pond and placed it in a lined RCRA hazardous waste closure cell, along with material from its other ponds. Goodrich then backfilled the area where Pond 4 had been located to create a level, open ground surface. Pond 4 was certified as closed by the Natural Resources and Environmental Protection Cabinet of the Commonwealth of Kentucky, the predecessor to the Environmental and Public Protection Cabinet (the "Cabinet"), in 1989.

On September 29, 1989, the Cabinet and the United States Environmental Protection Agency ("EPA") issued permits to Goodrich under RCRA and the Hazardous and Solid Waste Amendments (collectively the "1989 Permit"), with permit number KYD-006-370-167. The 1989 Permit required Goodrich to monitor and maintain the closure cell's integrity for at least the next thirty-six years, to remediate contamination at the Facility, and to take responsibility for environmental issues involving the Pond 4 post-closure requirements.[1]

In 1996, Goodrich submitted to the Cabinet a clean closure equivalency demonstration ("CCED") for Pond 4. The purpose of a CCED is to demonstrate that a unit is closed according to applicable regulations and that the unit requires no further action to address environmental concerns.

In 1993, Goodrich sold its vinyl business, previously operated as Goodrich's Geon Vinyls Division. Goodrich transferred to Geon Company, a newly-formed and wholly-owned subsidiary, hundreds of millions of dollars in assets and liabilities. This transaction is documented in an Amended and Restated Separation Agreement effective March 1, 1993 (the "1993 Separation Agreement") and related ancillary contracts (collectively the "1993 Agreements"). Goodrich transferred to Geon substantially all of the remaining assets of its vinyl business by executing and delivering an Amended and Restated General Assignment and Bill of Sale Relating to the Goodrich PVC Business dated March 1, 1993 (the "1993 Bill of Sale"). The ethylene plant and chlorine plant (collectively referred to as the "CA&O Plant") and its assets were excluded from the 1993 Agreements and the 1993 Bill of Sale. As a result, Goodrich retained ownership of the CA&O Plant assets.

Under the Amended and Restated Assumption of Liabilities and Indemnification Agreement

---

[1] PolyOne disputes that Pond 4 is covered by Goodrich's Permit.

Relating to the Goodrich PVC Business dated March 1, 1993 (the "1993 ALIA") Geon assumed certain environmental obligations and liabilities of Goodrich. Generally, Geon assumed all of Goodrich's obligations and liabilities relating to the Goodrich PVC Business, which was defined to include all of Goodrich's Calvert City environmental liabilities and obligations associated with the EDC/VCM Plant, the CA&O Plant, the RCRA Permit and other permits, the Plantwide Corrective Action Program ("PCAP"), and the Calvert City Environmental Sites, and all of Goodrich's liabilities to Westlake arising out of the operation of the assets transferred to Westlake under the 1990 Agreement.[2] The 1993 Separation Agreement states:

> It is the intent of the parties that any and all liabilities of the Goodrich PVC Business, disclosed or undisclosed, heretofore or hereafter arising, of every nature whatsoever be transferred to and assumed by Geon and that Geon indemnify and hold Goodrich harmless with respect thereto.

This direct assumption of liabilities was accompanied by a series of parallel indemnity obligations on Geon's part.

In the 1993 ALIA, PolyOne, as Geon's successor, agreed to "defend and indemnify Goodrich, from every claim, demand, obligation, liability, cost and expense . . . relating to or arising out of the Goodrich PVC business . . . and/or . . . each and every obligation of Goodrich specifically described" in the 1993 ALIA.[3] If an action is brought or a claim made against Goodrich, and Goodrich determines that indemnification may be sought from PolyOne for that claim or action, in

---

[2] As the Permit holder, Goodrich was legally obligated to develop and implement a corrective action program to clean up the groundwater to a concentration standard established by law and regulation. This program is known as PCAP. Pond 4 is subject to these corrective actions.

[3] Geon merged with M.A. Hanna Company in September 2000 to form PolyOne. PolyOne and Geon will be used interchangeably for purposes of this motion

3

whole or in part, Goodrich is to notify PolyOne of the claim or action in writing and PolyOne "shall assume the defense of such action or claim, including the employment of counsel," subject to certain exceptions. In the event that PolyOne refuses to do so, Goodrich "shall be entitled, upon notice to [PolyOne], to employ its own counsel and retain control of its own defense, but at the expense of [PolyOne].

The 1993 ALIA provided PolyOne, as Geon's successor, with the right to prosecute in Goodrich's name, any claims Goodrich may have against third parties for contractual indemnity:

> PROVIDED FURTHER THAT Goodrich shall make available to [PolyOne] to the extent it can (but without the obligation for Goodrich to incur any costs or assume any liabilities) the benefit of any assumption of liability or indemnification provision in any agreement with third parties with respect to liabilities assumed by [PolyOne] hereby.

In 1997, Goodrich sold the CA&O Plant to Westlake, including the property where Pond 4 had been located. The sale was memorialized in a July 16, 1997 Purchase and Sale Agreement and an amendment dated August 15, 1997 (together the "1997 PSA"). Pursuant to a joint request by Goodrich and Westlake, the Cabinet issued a letter on July 29, 1997, stating that Westlake would not need to be added to the 1989 Permit by virtue of its acquisition of the CA&O Plant and that Goodrich would remain responsible for activities related to the 1989 Permit on the property conveyed to Westlake.

Pursuant to Section 1.4(d) of the 1997 Agreement, Goodrich expressly agreed to retain all liabilities arising out of the assets sold to Westlake:

> Westlake, however, shall not assume any liability or obligation, known or unknown, fixed, contingent or otherwise of [Goodrich], and [Goodrich] and its affiliates shall retain all liabilities and obligations, whether primary or secondary, direct or indirect, or fixed, absolute or contingent, with respect to or arising out of the use, operation or ownership of the CA&O Plant, or the ownership, possession or use of the Assets, or the employment or compensation of any of the employees, prior to the Closing,

unless expressly provided otherwise herein, all of such liabilities or obligations being herein referred to as the "Retained Liabilities".

The term Assets is defined in Section 1.1 of the 1997 Agreement as "the assets and properties described in Section 1.2" of the 1997 Agreement. Pond 4 is specifically included in the amended Section 1.2 and thus qualifies as an Asset under Section 1.4(d) of the 1997 Agreement. Pond 4 was also used by Goodrich in connection with the CA&O Plant.

Section 8.2 of the 1997 Agreement contains an indemnification clause:

8.2.<u>Indemnification by [Goodrich]</u>. From and after the Closing, [Goodrich] shall indemnify and save Westlake harmless from and against any and all loss, cost, damage, claim, judgment, fine, penalty, debt, liability or expense, including, without limitation, reasonable fees and disbursements of counsel incurred by Westlake in investigating and defending any such claim with reimbursement on a current basis (herein collectively referred to as "Liability" or "Liabilities") which results from or arises out of or occurs in connection with:

(a) the Retained Liabilities;

(b) . . . any breach of any covenant, representation, warranty, agreement or obligation of [Goodrich] contained herein . . . ;

(c) . . . damage to any property or the investigation or remediation of any soil, surface water and/or groundwater resulting from or attributable to events occurring or any condition existing prior to the Closing Date and arising in any way incident to the ownership, use and/or operation of the CA&O Plant by [Goodrich] prior to the Closing Date . . .

Pursuant to Section 8.4 of the 1997 Agreement, Westlake is entitled to recover from Goodrich under Section 8.2 if Westlake's loss equals or exceeds $100,000, or equals or exceeds $25,000 with respect to any loss incurred pursuant to Section 8.2(c). Westlake incurred a comparable indemnity obligation.

As part of the 1997 PSA, Goodrich and Westlake agreed that Westlake could reconvey the Pond 4 property to Goodrich upon the occurrence of certain events. Section 1.2(a) of the 1997 PSA

5

states, in pertinent part:

> [T]he portion of the property formerly used as the # 4 pond by [Goodrich] shall be subject to reconveyance to [Goodrich] in the event that Westlake's ownership of the # 4 pond would in and of itself be solely responsible for Westlake's being added as a permittee to the [Goodrich] RCRA Permits, as those terms are defined in the Environmental Services Agreement prepared pursuant to Section 6.6 until such time as said pond # 4 receives confirmation of clean closure at which time [Goodrich] shall promptly reconvey such property to Westlake . . .

The referenced Environmental Services Agreement ("ESA") defining Goodrich's RCRA Permits states:

> The hazardous waste landfill and two adjacent ponds are currently undergoing post-closure care pursuant to Subtitle C of the Resource Conservation and Recovery Act ("RCRA") as amended by the Hazardous and Solid Waste Amendments ("HSWA"). The post-closure care is required by the Commonwealth of Kentucky Natural Resources and Environmental Protection Cabinet . . . and the United States Environmental Protection Agency . . . under RCRA and HSWA Permits #KYD-006-370-167 (hereinafter collectively referred to as "Permits").

Goodrich withdrew its CCED application in December of 2000. Following Goodrich's withdrawal of the CCED, it did not take any further action to resolve environmental issues related to Pond 4.

On September 30, 2003, the Cabinet reissued the Permits under the same Permit Number KYD-006-370-167 to Goodrich. Goodrich remains responsible for Pond 4 under the 2003 Permit.

On January 9, 2004, the Cabinet requested that Westlake submit a RCRA Part B Post Closure permit application for former Pond 4. Opting not to submit the Application, Westlake challenged the January 9, 2004 Cabinet decision by initiating an administrative proceeding on February 6, 2004 ("Administrative Proceeding"). The Administrative Proceeding has yet to be resolved. Additionally, Westlake has begun preparing a Part B permit application for Pond 4. Westlake also attempted to reconvey Pond 4 to Goodrich on April 15, 2004. Goodrich refused to accept the

6

reconveyance.

> Westlake filed this Complaint on March 21, 2005, alleging that:
>
> Due to the Cabinet's determination that Westlake's ownership of the area of former Pond 4 requires it to assume the RCRA permit obligations of Goodrich, Westlake has the right, pursuant to paragraph 1.2(a) of the 1997 PSA Amendment, to reconvey former Pond 4 back to Goodrich.

Westlake also seeks an order forcing Goodrich to indemnify Westlake, asserting that the costs in undertaking all of these activities constitute losses arising out of Westlake's ownership of the real property where Pond 4 was located, for which Goodrich is obligated to indemnify Westlake and pay Westlake's attorneys fees.

Goodrich provided a written tender of the defense of Westlake's Complaint to PolyOne and an offer of rights, by letters dated March 31 and April 15, 2005. On April 19, 2005, PolyOne refused the tender of Goodrich's defense. On September 6, 2005, Goodrich filed a Third Party Complaint against PolyOne alleging that PolyOne is liable to Goodrich for all of Westlake's claims for damages against Goodrich in the Complaint. On August 30, 2005, PolyOne filed a Motion to Dismiss Goodrich's Third Party Complaint.

## STANDARD

PolyOne has moved the Court to dismiss under FED. R. CIV. P. 12(b)(6) for failure to state a claim upon which relief may be granted. "When considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the district court must accept all of the allegations in the complaint as true, and construe the complaint liberally in favor of the plaintiff." *Lawrence v. Chancery Court of Tenn.*, 188 F.3d 687, 691 (6th Cir. 1999) (citing *Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995)). Denial of the motion is proper "unless it can be established beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

7

*Achterhof v. Selvaggio*, 886 F.2d 826, 831 (6th Cir.1989) (citing *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).  Nonetheless, unwarranted factual inferences or legal conclusions masquerading as fact will not prevent a motion to dismiss.  *Blakely v. United States*, 276 F.3d 853, 863 (6th Cir. 2002).  A "complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Andrews v. Ohio*, 104 F.3d 803, 806 (6th Cir. 1997) (citing *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993)).

PolyOne has also moved the Court to dismiss based on ripeness grounds which are technically motions to dismiss based upon the lack of subject matter jurisdiction under FED. R. CIV. P. 12(b)(1).  When considering 12(b)(1) motions that attack the factual existence of subject matter jurisdiction," no presumptive truthfulness applies to the factual allegations" and "the court is free to weigh the evidence and satisfy itself as the existence of its power to hear the case." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).

## DISCUSSION

**I.      INDEMNIFICATION**

In Westlake's Complaint, Westlake asserts that Pond 4 is a retained liability under the 1997 PSA, and, therefore, pursuant to Paragraph 8.2 of the 1997 PSA, Goodrich is required to indemnify Westlake for all of Westlake's losses arising from its ownership of the real property where Pond 4 is located, including Westlake's attorneys fees.[4]  Goodrich asserts that, pursuant to the 1993 Agreements, PolyOne must indemnify Goodrich for any liability that Goodrich may have to Westlake.  PolyOne argues that because the alleged damages arise solely from the 1997 PSA

---

[4] This Court previously dismissed Counts I and III of Westlake's Complaint asserting breach of contract and asking for a declaratory judgment that Goodrich is required to accept Westlake's reconveyance of Pond 4.

8

between Westlake and Goodrich, to which PolyOne was not a party, PolyOne cannot be held legally responsible to indemnify Goodrich for damages arising from Goodrich's alleged breach of the 1997 PSA.

The 1993 Agreements govern the scope of PolyOne's indemnification obligations to Goodrich. As this is a diversity action, the Court applies the substantive law of Kentucky, including its choice of law standards. *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 501 (6th Cir. 2003). The 1993 Agreements provide that they are to be governed by Ohio law. The Sixth Circuit recognizes that Kentucky will enforce contractual choice of law provisions "unless 'the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice.'" *Bank of N.Y. v. Janowick*, 470 F.3d 264, 271 n.3 (6th Cir. 2006) (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2)(a) (1999)). At the time of the divestiture, both Goodrich and Geon were headquartered in Ohio. Thus, the Court finds that the choice of Ohio law is reasonable and therefore will apply Ohio law to determine the obligations of the parties under the 1993 Agreements.

In *McClorey v. Hamilton County Board of Elections*, an Ohio appellate court summarized principles of contract interpretation that have been articulated by the Supreme Court of Ohio:

> In the construction of a written contract, it will be read as a whole, and the intent of each part will be gathered from a consideration of the whole. The language and terms of the contract are to be given their plain, common, and ordinary meanings. But if the language is ambiguous, then a court must construe the language against the party who prepared the contract. Language is ambiguous if it is reasonably susceptible of two or more constructions.

720 N.E.2d 954, 956-57 (Ohio Ct. App. 1998) (quoted in *Mead Corp. v. ABB Power Generation, Inc.*, 319 F.3d 790, 797 (6th Cir. 2003)).

Under the 1993 ALIA, PolyOne assumed and agreed to pay each and every obligation and

liability of Goodrich under the Permit, PCAP, and the CA&O Plant subject to the following provision:

> NOTWITHSTANDING ANY OTHER PROVISION OF THIS ASSUMPTION OF LIABILITIES AND INDEMNIFICATION AGREEMENT, this Assumption of Liabilities and Indemnification Agreement is not intended to expand the scope of any liabilities assumed hereunder or to create any liabilities for [PolyOne] that Goodrich did not previously have, and [PolyOne] does not intend hereby to undertake any liability or obligations of any Person other than Goodrich.

Pond 4 was covered by Goodrich's RCRA Permit at the time of the 1993 Agreements. As the sole permittee for the Site, Goodrich is legally obligated to comply or ensure compliance with all conditions of the Permit. These legal obligations include operating and adequately funding the PCAP. Goodrich has been under this obligation since October 29, 1989, the Permit's effective date. Thus, at the time that the 1993 ALIA was entered into, Goodrich was under a legal obligation to remediate the Site pursuant to the Permit, including the area of Pond 4. Goodrich is entitled to seek indemnification under the 1993 ALIA for these remediation efforts.

Goodrich's CCED application was never approved by the Cabinet and has been withdrawn. Thus, there has been no finding by the Cabinet that the unit does not require further action to address environmental concerns. As recognized by all parties, any contamination at the Pond 4 area was caused prior to 1986. There are no allegations that Westlake caused any of the contamination.

Accepting all allegations in the Complaint as true and construing the Complaint liberally in favor of the plaintiff, this Court finds that the Complaint makes a claim for indemnification for damages relating to the contamination of Pond 4. This Court reads the Complaint as alleging that if Pond 4 had been closed and required no further action to address environmental concerns then the Cabinet would not have sought to have Westlake submit an RCRA Part B Post Closure permit application for Pond 4. Thus Westlake's Complaint can be read as stating a claim for damages

arising from Goodrich's pre-1986 contamination of Pond 4. Under the 1993 ALIA, PolyOne is liable to Goodrich for remediation costs relating to Pond 4. Thus, this set of facts would arguably entitle Goodrich to relief.

## II.     RIPENESS

PolyOne asserts that because Goodrich's alleged requirement to indemnify Westlake for permit application expenses hinges on several determinations by the Cabinet, Goodrich's claim for indemnification against PolyOne arising from the RCRA permit application component of Westlake's Count II is not yet ripe for adjudication. PolyOne states that if Westlake loses its appeal of the Cabinet's determination that Westlake is legally obligated to have a permit for Pond 4, then Westlake may have no valid claim against Goodrich to recover the cost to prepare an application required by law. Goodrich agrees that Westlake's claims are not yet ripe; however, Goodrich asserts that as long as there remain claims asserting potential liability against Goodrich, Goodrich's indemnity claims against PolyOne must necessarily have arisen and therefore be ripe as well. Goodrich also states that the mere fact that PolyOne refused to defend Goodrich in this action entitles Goodrich to recover its expenses incurred in defending itself.

This Court finds that any claims for indemnification that Goodrich has against PolyOne are ripe at this time. Although the parties dispute the ripeness of the claims in Westlake's Complaint, the complaint at issue before the Court in the present motion is Goodrich's Third Party Complaint. PolyOne has failed to argue, nor can this Court find, that if Westlake has a valid claim for against Goodrich, Goodrich's claim for indemnification from PolyOne would not be ripe.

## III.    NOVATION

PolyOne asserts that even if Goodrich did spin off certain Pond 4 liabilities to PolyOne in

the 1993 Agreements, those claims have been superseded by the 1997 PSA, arguing that the 1997 PSA affected a novation of any obligations PolyOne may have had with respect to Pond 4.

"A novation substitutes a new party and discharges one of the original parties to a contract by agreement of all parties." *Power-Tek Solutions Servs., LLC v. Techlink, Inc.*, 403 F.3d 353, 359 (quoting BLACK'S LAW DICTIONARY 1064 (6th ed. 1990)). "[O]ne of the basic requirements of a novation is the intention of the parties to the original contract to completely do away with the original contract obligation." *Citizens State Bank v. Richart*, 476 N.E.2d 383, 385 (Ohio Ct. App. 1984). "[T]here must be a clear and definite intention on the part of all concerned that such is the purpose of the agreement, for it is a well-settled principle that novation is never to be presumed." *Id.* (quoting *Grant-Holub Co. v. Goodman*, 23 Ohio App. 540, 546 (1926)).

The matter of intent is a question of fact. *Id.* Goodrich argues that there is no evidence that Westlake and Goodrich expressly agreed to release PolyOne from the 1993 ALIA or that PolyOne joined in any such agreement. Goodrich also argues that there is no indication that the 1997 PSA was intended to substitute Westlake as the obligor for obligations arising from pollution that PolyOne might have once had to Goodrich under the 1993 Agreements. PolyOne does not dispute that consent of all parties is required before a novation is effective, but asserts that the parties' consent is implied by the facts and circumstances attending the transaction and the conduct of the parties thereafter.

While it is true that "it is not essential that the assent to and acceptance of the terms of novation be shown in express words to that effect, but the same may be established by sufficient attending facts, circumstances and subsequent course of conduct," *Union Cent. Life Ins. Co. v. Hoyer*, 66 Ohio St. 344, 348 (1902), accepting all the allegations in the complaint as true and

12

construing the complaint liberally in favor of PolyOne, the Court cannot find at this juncture that all parties intended to do away with PolyOne's obligations pursuant to the 1993 ALIA. *See Lawrence*, 188 F.3d at 691.

## CONCLUSION

For the foregoing reasons, PolyOne's Motion to Dismiss is DENIED.

An appropriate order shall issue.